UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 4:23-CR-163 |
| v. | : | |
| | : | (C.J. BRANN) |
| JEREMY PAULEY, | : | |
| Defendant | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

### I.    INTRODUCTION

Defendant Jeremy Pauley ("Pauley") relishes his position as a notorious, financially successful trafficker of human remains.  Pauley continues to seek out and occupy a central place within the market and sale of human remains and other so-called "oddities."  The instant investigation uncovered an extensive underground network of the theft and sale of hearts, hands, brains, and faces.  Most shocking was the discovery of the theft and sale of the bodies of dead babies from hospitals and morgues.

Pauley was and remains a central figure in this disturbing market and is a central figure in the nine federal prosecutions that arose from this investigation.   He caused deep emotional harm to an untold

1

number of family members left to wonder about the mistreatment of their loved ones' bodies.

Accordingly, the United States respectfully recommends that the Court vary upward from the Guidelines range and impose a sentence of imprisonment of 180 months.

The United State also asks that the Court impose a fine of $20,000, order $1,700 in restitution, and recommends incarceration be followed by four years of supervised release.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Jeremy Pauley resided within the Middle District of Pennsylvania during all times relevant to the charges in the Information.  Pauley was in the business of buying and selling human remains.  Pauley used Facebook to advertise remains for sale and to communicate with other individuals with an interest in buying, selling, and collecting human remains.  Pauley used PayPal to send and receive funds related to transactions wherein he sold or bought human remains, and the U.S. Postal Service to ship and receive remains.

Between at least 2021 and 2022, Pauley obtained human remains from Katrina Maclean and Joshua Taylor on multiple occasions.  Pauley

maintained an ongoing business relationship with Maclean and with Taylor. Maclean and Taylor provided Pauley with remains in exchange for payment or trade, and were aware that Pauley was in the business of selling human remains. Pauley knew that the remains provided to him by Maclean and Taylor were stolen from the morgue at Harvard Medical School, in Boston, Massachusetts, by a source of supply who was employed there. Maclean and Taylor shipped the remains, obtained in Massachusetts, through U.S. Mail to Pauley in Pennsylvania.

In fact, Maclean and Taylor purchased the remains they sold from Cedric Lodge, the manager of the morgue at Harvard Medical School. Lodge stole parts from donated cadavers prior to cremation and sold them to Maclean, Taylor, and others, between at least 2018 and 2022. By agreement, Lodge would allow Maclean and Taylor into the morgue to choose what parts they wanted to purchase, including skin, whole and partial heads and faces, brains, internal organs, and bones. The goal of the overall conspiracy was for all parties to profit from the sale of human remains. The members of the agreement depended on one

3

another for supply and payment, and developed a mutual trust in their transactions.

Additionally, beginning in October 2021, Pauley began purchasing human remains from Candace Chapman-Scott, an employee of a crematorium in Arkansas. Pauley knew that Chapman-Scott was supposed to have cremated the remains, but instead stole them from her place of employment and sold them to Pauley. Pauley communicated with Chapman-Scott through Facebook and sent payments via PayPal. Chapman-Scott shipped the purchased remains through the United States mail from Arkansas to Pennsylvania. The remains Pauley purchased from Chapman-Scott included brains, internal organs, and two stillborn fetal corpses.

Pauley sold many of the stolen remains he purchased from Maclean, Taylor, and Chapman-Scott. Matthew Lampi, with whom Pauley had an ongoing business relationship, buying, selling, and trading human remains between them, purchased several of the specimens that originated in Arkansas, knowing that Pauley had obtained them from an individual who stole them from a crematorium

4

in Arkansas.  Pauley shipped the remains, including one stillborn

corpse, from Pennsylvania to Lampi in Minnesota.

On June 14, 2023, a two-count Information was filed charging

Pauley with Conspiracy to Commit Interstate Transportation of Stolen

Goods and Interstate Transportation of Stolen Goods in violation of 18

U.S.C. §§ 371 and 2314.  Doc. 1.

On September 7, 2023, Pauley pled guilty to the Information

pursuant to a plea agreement.  PSR ¶¶ 1-2.

## III.  PROCEDURE

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), which

rendered the United States Sentencing Commission Guidelines Manual

("USSG") advisory, the Court of Appeals set forth a three-step process

when imposing a sentence:

1.  Courts must continue to calculate a defendant's USSG

    sentence, regardless of *Booker*;

2.  In doing so, they must formally rule on the motions of both

    parties, state on the record whether the Court is granting a

    departure and how that departure affects the USSG

    calculation, and consider pre-*Booker* case law, which continues

to have advisory force; and

3. Courts are required to exercise their discretion by considering the relevant factors set forth in Title 18, United States Code, Section 3553(a), when imposing a sentence, regardless of whether it varies from the sentence calculated under the USSG.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006).

As of November 1, 2025, the Sentencing Commission simplified the Guidelines by removing step two of the three-step sentencing process. As amended, the Guidelines now provide a two-step sentencing process. This amendment removed most of the departures previously provided throughout the Guidelines Manual, including the upward departures previously recommended in related cases under USSG §5K2.8. Extreme Conduct and USSG §5K2.0(a)(2) for aggravating factors not adequately considered by the sentencing guidelines.

The United States will address the need for a 180-month sentence as an upward variance necessary to achieve the § 3553(a) factors.

### A. Sentencing Guidelines Calculation

6

The government notes that the guidelines calculation in the final Presentence Report ("PSR") is a total offense level 10 and Criminal History Category of III for an advisory range of 10 to 16 months of imprisonment and anticipates that will be the advisory range determined at sentencing. PSR ¶ 98.

(1)    Objections

### a. Loss

The United States acknowledges the Court's Memorandum and Opinion of August 24, 2024, (Doc. 40), regarding the issue of loss in view of *United States v. Banks,* 55 F.4th 246, 256 (3d Cir. 2022), but incorporates the arguments set forth in its Brief in Opposition filed (Doc. 35) and formally objects to Paragraph 45 of the PSR.  Had the loss calculation been included, the offense level would have increased by 14 levels under §2B1.1(b)(1) of the Guidelines.

### b. Acceptance of responsibility

The defendant should not be awarded acceptance of responsibility. After facing state charges and federal charges for his conduct, Jeremy Pauley chose to lean in.  He and his partner, Sophie, opened a shop in Honesdale.   Pauley continues to make a living through buying and

7

selling human remains.  He has come, again, into possession of the

bodies of dead babies.  His conduct is wholly inconsistent with

acceptance of responsibility. *See* Gov. Ex 1 (filed under seal) (collecting

social media posts from Pauley that depict his ongoing collection of:

dead babies, leather made of human skin, candles made from human

fat, and reference to the addition of "wets" to his shop.)

While Pauley argues that the entirety of his post-indictment

conduct is legal, it is not.  Throughout this investigation, having

conducted dozens of interviews of individuals who engage in the buying,

selling, stealing, collecting, and preservation of human remains, the

government has yet to identify a legal means of obtaining organs, skin,

fetuses, or other parts of deceased human beings. The people who

engage in this type of commerce maintain a don't-ask-don't-tell practice,

where they often willfully ignore the provenance of the remains in

which they trade.  In some cases, sellers will deliberately age a

specimen to make it appear to be an antique, disguising the recency of

its acquisition and hiding it true origins.

In over two years of investigation, the government has positively

identified three original sources of human remains, and all were

8

facilities from which remains were stolen. Those were a hospital, a medical school morgue, and a crematorium. None of the so-called "oddities collectors" interviewed have ever produced any evidence that the human remains they possessed were lawfully acquired. Many have claimed certain items came from a "private collection," or were previously owned for "educational purposes," but none could explain how their previous owners came to acquire them. The government understands that there may exist historical specimens of bones, skulls, or even teeth that are so old, a true origin may be impossible to identify. But with respect to fetal remains, internal organs, which Pauley and other remains traffickers refer to as "wet specimens" or "wets," there are no identified legal means by which a private collector or seller can acquire those remains. These remains are invariably stolen.

Moreover, the law in Pennsylvania concerning abuse of a corpse is expansive. Pauley's ongoing conduct concerning fetal remains is a crime. The statute states that it is an offense to "treat a corpse in a way that one knows would outrage ordinary family sensibilities." 18 Pa.C.S.A. § 5510 (defining the crime of abuse of a corpse). The language of the statute is objective, not subjective. Inaction by a decedent's

9

mother has been upheld as abuse of a corpse. See *Commonwealth v. Smith*, 389 Pa.Super. 606, 567 A.2d 1070 (1989) (upholding the conviction of a mother who abandoned the body of her dead toddler and allowed it to rot).  There, the Superior Court found that the "purpose of drafting the abuse of corpse statute in very broad and general language was to ensure that offenses such as concealing a corpse came under the purview of the statute."

Acquiring, dying, and displaying the bodies of dead infants may not offend Pauley, but it offends ordinary family sensibilities *See* Gov. Ex 1, pp. 14, 15, 19-22.

Moreover, his ongoing pursuit and commitment to notoriety within the oddities community is inconsistent with acceptance of responsibility. It should not be awarded.  *See* Gov. Ex 1, p. 18.

### c.  Mass-marketing

Section 2B1.1(b)(2)(A)(ii) assesses a two-point enhancement on the offense level where the offense "was committed through mass-marketing."  As the Third Circuit has now held, unless the Guideline's text is ambiguous and the comment provides clarity, the text alone

controls. *See United States v. Chandler*, 104 F.4th 445, 450 (3d Cir.

2024) (citing *United States v. Nasir*, 17 F4th 459, 471 (3d Cir. 2021).

The text does not appear to be ambiguous. It simply asks a court to

consider whether the offense – here the interstate transport of stolen

body parts – was committed through marketing those goods to the

masses.

In the instant offense, the defendant publicly advertised stolen

human remains for sale on Facebook, a website with millions of users –

and in groups with thousands of interested potential buyers. It was

through these platforms that the defendant forged relationships with

multiple sellers, to include Candace Chapman Scott.

Her first message to Pauley was:

Hey Jeremy! I follow your page and work and LOVE it. I'm a
mortician and work at a trade service mortuary, so we are
contracted through the medical hospital here in Little Rock
to cremate their cadavers when the medical students are
done with them before they discard them in a cremation
garden. Just out of curiosity, would you know anyone in the
market for a fully intact, embalmed brain???

*See* Gov Ex. 2, pp. 1-2

Those relationships gave rise to the trafficking of stolen human

remains at a profit of tens of thousands of dollars to Pauley. The text of

the guideline is unambiguous. The facts are clear. The enhancement is appropriately applied.

### d. Stolen Property

Defense objects to a two-level enhancement under USSG §2B1.1(b)(4) because the defendant was not in the business of selling *only* stolen property. The enhancement reads, "If the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property, increase by 2 levels." USSG §2B1.1(b)(4). In this case, Pauley received the remains that Chapman-Scott stole from Arkansas and that Cedric Lodge stole from the Harvard morgue. He then engaged in price negotiations before receiving the remains, including Baby Lux's body, and then selling them on to interested buyers. Pauley received and sold stolen property. The enhancement is properly applied.

With the application of those enhancements, the United States recommends a total offense level of 10, yielding an advisory range of 10 to 16 months.

As discussed more fully below, the remarkably low advisory guideline range in this case fails to reflect the egregious nature of the

12

criminal conduct at issue. The United States asks that this Court vary above the otherwise applicable guidelines range and impose a term of imprisonment of 180 months.[1]

## B. Factors In Support of an Upward Variance

The government makes this request for a number of reasons.

First, Pauley's conduct was unusually heinous, cruel, and degrading. While this case is unique, it is not singular. Similar cases prosecuted across the country have led to similar sentences. Other provisions of the Guidelines also point toward justice requiring that this Court impose a lengthy sentence of imprisonment.

Second, Pauley's criminal acts offend the rights of the dead and have inflicted grave suffering on an untold number of families.

Third, the United States will address Pauley's conduct with respect to Baby Lux as an example of the immeasurable harm done by Candace Chapman Scott, Matthew Lampi, and Jeremy Pauley.

(1) <u>The Unusually Heinous Sale of Human Remains</u>

---

[1] A upward variance of twenty-two levels results in an advisory guidelines range of 151 to 188 months.

First, the nature of this crime is incredibly heinous as compared to a run-of-the-mill interstate transportation of stolen goods case typically sentenced under the Guidelines. While departures are stylized as variances as of November 1, 2025, the *Queensborough* Court's reasoning in granting an upward departure remains persuasive. "Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. . . . Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guideline cases." *United States v. Queensborough*, 227 F.3d 149, 162 (3d Cir. 2000), quoting *Koon v. United States*, 518 U.S. 81, 98 (1996). *See also*, *United States v. Bull*, 828 F.3d 735, 739 (8d Cir. 2016) (upward departure warranted where conduct is "outside the heartland" of the typical case of its kind).

Nothing in § 2B1.1 accounts for the theft and sale of stolen human remains. In a "heartland" theft case, the Court is dealing with things – cars, tires, money. A Court need not address or contemplate the

14

emotional toll of a victim whose grief over losing a parent is compounded by the theft and exploitation of his mortal remains. Nor do the Guidelines account for circumstances where the theft and ensuing interstate transportation violate the dignity of the deceased.

Pauley and other individuals involved in the theft and interstate trade of human remains engaged in conduct far more egregious than the typical stolen goods case. Indeed, were it not for their actions in commodifying and profiting from the sale of stolen body parts, one might be reluctant to classify such remains as "goods" at all. But Pauley purchased stolen human faces and other parts of cadavers and turned them into "stock," selling pieces of deceased people, advertising his dark wares, and creating a marketplace for this appalling trade.

In one example, Cedric Lodge provided skin to Katrina Maclean so that she could have it tanned into leather by Jeremy Pauley. What a deeply horrifying reality for hundreds of families from Harvard's Anatomical Gift program to be left to contemplate. In another, Candace Chapman Scott sold a man's head to Pauley – perhaps to be kept on a shelf, perhaps to be used for something even more disturbing. What an impossible reality with which families must now grapple.

15

### a. *Other cases involving human remains*

While analogous prosecutions have been infrequent, there have been federal prosecutions of individuals engaged in the trafficking of stolen body parts, the fraudulent sale of human remains, and fraudulent actions related to human remains.  Each time, forced to craft sentences for such heinous conduct, Courts have sentenced defendants to lengthy terms of imprisonment, often well above the advisory guidelines ranges and to commensurate or longer sentences than the 180-month sentence sought here.

In *United States v. Rathburn, et al.*, the main defendant, Arthur Rathburn, who operated a medical corporation, was convicted at trial of seven counts of wire fraud and transportation of hazardous materials for defrauding buyers of cadavers donated for science. 771 Fed.Appx. 614 (6th Cir. 2019).  He dismembered and rented those cadavers for medical and dental training in some cases without disclosing medical facts to include infectious diseases.  *Id.* at 618-619.  Rathburn was

sentenced to 108 months' imprisonment on the wire fraud charges.[2] Rathburn's wife and co-defendant, testified at trial. She pled guilty and was sentenced to 24 months' probation. *Id.*[3]

In *United States v. Hess, et al.*, No. 1:20-CR-98, funeral home operators Megan Hess and Shirley Koch, each pleaded guilty to wire fraud and aiding and abetting for their role in a scheme to illegally sell body parts or entire bodies for body broker services in the District of Colorado.  The victims did not consent to those sales or thought their family member had been cremated.  Hess and Koch delivered cremated remains to families with the representation that the cremated remains were that of their deceased loved one when, frequently, that was not the case.[4]

---

[2] Rathburn's guidelines were calculated as 135-168 months. The Government recommended a sentence of 168 months. Government's Memorandum in Aid of Sentencing, *United States v. Rathburn*, 2018 WL 2474003 (E.D.Mich. May 9, 2018).

[3] Sentencing information available at https://www.oig.dot.gov/library-item/36412, last visited Dec. 9, 2025.

[4] Case described at https://www.justice.gov/usao-co/pr/sunset-mesa-funeral-home-operators-sentenced-federal-prison-illegal-body-part-scheme, last visited Dec. 9, 2025.

Hess was sentenced *twice* to 240 months' imprisonment and Koch was sentenced *twice* to 180 months' imprisonment. The case was remanded by the Tenth Circuit Court of Appeals based on errors in calculating the loss amount and in its findings concerning several enhancements. The Court imposed the same sentences on April 24 and August 27, 2025. *See United States v. Hess*, 106 F.4th 1011 (10th Cir. 2024); *see also* Government Exhibit 1.

The defendants in both *Hess* and *Rathburn* were involved in schemes to sell body parts to body brokers for purposes of medical research or were selling infected or diseased parts for the same purpose. The facts of this case are worse. Here, the defendant was purchasing and then re-selling stolen human remains to keep in his own collection or to be sold and otherwise used for the diversion of the disturbing "oddities" community. Like the defendants in the *Hess* case, the defendant chose to sell the human remains for a purpose not contemplated by the victims. Like the defendants in *Hess* who delivered cremated remains when they did not belong to the deceased family member, Pauley's acts inflict families with a similar wound.

18

In a case arising from this investigation, *United States v. Candace Chapman Scott*, 4:23-CR-101, prosecuted in the Eastern District of Arkansas, the Court sentenced the defendant to the government's recommended 180 months.[5]  Scott, working as an apprentice mortician at a cremation business, repeatedly stole human remains, including the bodies of two stillborn babies, and trafficked them for profit to this defendant, Jeremy Pauley.  She did so with full knowledge that Pauley intended to "plastinate" or otherwise preserve them for display, or, in the case of pieces of skin, "tan" them to bind books. *United States v. Candace Chapman Scott*, 4:23-CR-101, *Doc. 61, p. 5.*

Most recently, in *United States v. Hallford*, 1:24-CR-113, in the District of Colorado, the Court imposed a 240-month sentence after refusing to accept an 11(c)(1)(C) agreement that capped the sentence at

---

[5] The advisory guidelines range appeared to be 10 to 16 months. *United States v. Candace Chapman-Scott*, 4:23-CR-101, Doc. 61, p. 2; sentencing information available at https://www.justice.gov/usao-edar/pr/little-rock-woman-sentenced-15-years-federal-prison-after-transporting-stolen-human, last visited Dec. 15, 2025.

19

180 months.[6]  Doc. 88, p. 1.   In that case, a funeral home director, Jon Hallford, accepted payment from families for attending to the bodies of their loved ones, while actually allowing 190 bodies to rot and decay in the funeral home contrary to the wishes of the families and terms of the victims' funeral contracts.  He provided decedent's family members with dry concrete mix instead of actual cremains.  Doc. 88, p. 13. Pauley's participation in this market has left families to be haunted in the same way as the victim families in *Hallford*.

### b. Analogous Guideline provisions

The United States notes that this Court already observed, "[t]he law does not always align with what one may believe is right, just, or fair" in determining that the loss enhancement under §2B1.1(b)(1) would not apply to these offenses. *United States v. Pauley*, 4:23-CR-163, Doc. 40, p. 1 (quoting *Reiner v. Northumberland Cnty.*, No. 4:24-CV-00493, 2024 WL 2216852, at *1 (M.D. Pa. May 15, 2024)).  But

---

[6] The advisory guidelines range appeared to be 78 to 97 months. *United States v. Hallford*, 1:24-CR-113, Doc. 88, p. 2; sentencing information available at https://www.justice.gov/usao-co/pr/colorado-springs-funeral-home-operator-sentenced-gruesome-fraud-scheme, last visited Dec. 9, 2025.

where a portion of the Guidelines may not directly control the advisory range or legally apply, as the Court has determined concerning the loss at issue here, courts *are* permitted to use analogous portions of the Guidelines in support of a departure or variance. *United States v. Larkin*, 629 F.3d 177, 193-194 (analogizing to a Guideline enhancement not applicable to the offense in support of a five-level increase in the offense conduct).

The Court should consider the following Guidelines in crafting an upward variance.

First, the United States suggests that justice requires an upward variance of fourteen levels to account for Pauley's monetary gains conservatively estimated to be between $250,000 and $550,000. *See* USSG §2B1.1(b)(1).

Moreover, the Court should take the opportunity to acknowledge the other challenges of this case vis a vis portions of the Guidelines. The loss suffered by the donors' and decedents' families is real and substantial, but not economic as required by the Guidelines to result in certain enhancements. Yet, in a fraud where 25 or more victims suffered substantial financial hardship, the offense would be increased

21

by 6 levels. *See* USSG §2B1.1(b)(2)(C).  Here, more than 25 families

suffered substantial and ongoing emotional hardship after Pauley put a

price on things so priceless.  A 6-level enhancement for that substantial

harm is appropriate.

Moreover, the donors and decedents were *people*, but the economic

statute of conviction does not implicate the serious enhancements

crafted to account for the trafficking of *people*.  Alien smuggling offers

insight. There, where a defendant treats more than 100 persons as

commodities to be moved and traded, a defendant faces a 9-level

enhancement.  S*ee* § 2L1.1(b)(2)(C).  A 9-level upward variance is

appropriate.

Paragraph 30 of the PSR reads **Victim Related Adjustment**: None.

That is legally correct.  But that is not fair, right or just. How was Baby

Lux not a victim? How was his mother not a victim? How are the

families of the people turned into items for sale at the request and at

the hands of Jeremy Pauley not victims of his offense? And they were, of

course, vulnerable – a woman recovering from a miscarriage, families

grieving, babies.  In an offense involving a large number of vulnerable

victims, a defendant faces a 4-level enhancement.  Pauley's sentence should reflect such an increase.

    2.   <u>The Ongoing Harm to the Deceased and Their Families</u>

Before turning to family members, the United States first acknowledges the victimization of the individuals from whom parts were stolen and sold.  Their organs, tissues, and limbs were harvested for profit and sold without their consent or the knowledge or permission of their next of kin to be used as decoration or for the amusement of bizarre people interested in the macabre.

It is no exaggeration to describe the twisted conduct in this case as a human rights violation, a desecration of societal norms and long-held human notions of right and wrong.  This practice violates the human dignity of the deceased and inflicts suffering on their loved ones.

"The notion that the bodies of the dead and their human remains deserve respect and a dignified treatment is common to and deeply embedded within different societal, religious, and cultural traditions. Legal protections governing the treatment of dead bodies have long been established within international humanitarian law, international

criminal law, human rights law, and domestic laws. . . .  The treatment of dead bodies is also of concern to international criminal law, which prohibits the mutilation of the dead. Violation of the bodies of the dead is increasingly recognized as an element of crime, as an attack on personal dignity."  United Nations Office of the High Commissioner for Human Rights, Special Rapporteur, Apr. 25, 2024.[7]

"The protection of and respect for the dead is something that makes us human. It's prevalent, since the beginning of humanity, in all cultures and religions and is regulated in religious, cultural and social practices around the world, in national laws and also in International Humanitarian Law that applies in times of war.  The protection of the bodies and human remains of deceased persons . . . in many cases affects other rights of the victim and his or her family members. . . . There are a range of rights that are affected when there is no access to the body, when the victim's body is mutilated, destroyed,

---

[7] Available at https://www.ohchr.org/en/calls-for-input/2024/call-input-protection-dead-persons-and-their-human-remains-including-victims, last visited Dec. 20, 2024.

24

when their dignity is not respected."  Tidball-Binz, Morris, "Protecting and respecting the dead makes us human," July 5, 2024.[8]

"Death does not erase human dignity, either immediately or completely. The consequences of certain acts of self-determination reach beyond death, and command suitable respect. Human rights are rights accruing to the living; they protect and facilitate life itself. It is only possible to speak of rights of the dead in the sense that some acquired legal rights last beyond death, such as the right to be buried. Caring for the dead in a manner appropriate to human dignity is primarily significant for the next of kin. Denying this right means that the next of kin are prevented from making their peace with the loss of an individual who is close to them. Suitable care for the dead is thus a right of the living."  German Commission for Justice and Peace, "How society cares for the dead – a matter of human dignity!" July 2024.[9]

---

[8] Available at https://www.ohchr.org/en/stories/2024/07/protecting-and-respecting-dead-makes-us-human, last visited Dec. 20, 2024.
[9] Available at https://www.partner-religion-development.org/wp-content/uploads/2024/09/How-society-cares-for-the-dead-%E2%80%93-a-matter-of-human-dignity.pdf, last visited Dec. 20, 2024.

Finally, the United States acknowledges the suffering of the many families impacted by Pauley's conduct in support of the 180-month sentence. The conduct in this case strikes to the heart of one of the quintessential human experiences – death and the grieving process. When humans die, their loved ones frequently find solace in the peace they hope we find in death. The theft and sale of these remains for profit is a violation of any notion of peace for the dead and those who love them, and shatters any sense of security they might have felt in the belief that their loved ones were treated with dignity and respect in their final disposition.

Their own words support an upward variance:

- I cannot describe the utter horror and shock when I learned that someone was stealing and selling body parts of individuals who had donated their bodies to Harvard. I felt nauseous, angry and powerless. The crime had already happened and there is no way of knowing if, where and when parts of my mother may have been sold as the result of Mr. Pauley's (and others) selfishness, greed and depravity. I am speechless at the utter disregard to both the donors and their families. I hope that Mr. Pauley will be given the maximum sentence possible for this unspeakable crime. He took what was already a sad situation, the loss of a parent, and turned it into a horrible crime.

- The unknowing reality of what exactly happened to my mother has caused me to have ptsd, nightmares and panic attacks. I used to go to sleep at night looking forward to my next dream with my

26

mother. Will she be playing with my hair or will we be camping in mountains? Now, I go to bed at night fearful of what is coming next. Will I be finding my mother decapitated in the woods again, finding her head in a barrel by the shore, watching someone eat her heart or witness her screams as she is getting pulled apart to be sold. This is only a glimpse of my haunting nightmares.

- When my Mom passed away I was present with her and went to great pains to ensure a dignified departure for her last trip, from Maine to Harvard Medical School…The realization that my Mom was subjected to such disrespect and dehumanized is a continual torment that has left me shattered.

- The man our family had once known had already disappeared by the time he finally passed due to dementia and we hoped he finally would find peace in death. To later learn that his body may have been so grotesquely mishandled upon his demise is beyond words, an unconsolably horrible reality that we have to somehow reconcile without any chance of the truth of his fate possibly being found now. It seems impossible that any court proceeding could really resolve that situation for the survivors. Our family can only hope that some form of justice is brought to the perpetrators of this unthinkable situation so that future families will not have to live with this type of unknown about the fate of their loved ones.

- … [A]t this point we do not know and may never know if our loved one was 'spared' we have had to psychologically suffer the scenario that our loved one was essentially mutilated and sold piecemeal. Mr. Pauley as a buyer of human remains participated in this deeply corrupt act. While the physical body of the donor may have been already 'dead', their memory and spirit in many cases was alive in their surviving family. The knowledge that their bodies were treated so heinously is like learning what a serial killer may have done to a victim--and in a public manner at that.

- Her remains may have been desecrated by these monsters. And her family is left with this uncertainty. Is it my Grandmother buried next to my Grandfather in Tewksbury? Is it a stranger lying next to him rather than his wife? Was she taken apart and sent across the country to be made into a lamp or a book? Will we one day receive word that her head was found in a glass display case? Will we ever know?

- What is even worse is not knowing what may have been removed from him, where they were taken to, and what they were used for. Mr. Pauley abhorrent actions has shaken the very core of our beliefs and trust in the medical system that our father truly believed in. There isn't a day that goes by that one of us doesn't feel grief, disgust and is appalled that someone could do this with so little regard for another human being and no tifought for their loved ones. We would like to see Mr. Pauley sentenced to the maximum time allowed, seeing how he has sentenced us to a lifetime of uncertainty of not knowing where the rest of our father may be.

- It isn't really possible for me to express in words how utterly shocking it was to learn that the sick fetishes of the man before you likely impacted my father. It never occurred to me that something like this could happen, it wasn't something I could have prepared for. I feel ill, my heart rate increases, and I become overwhelmed by emotions when thoughts about this come into my mind. I can't visit his grave without wondering how much of him is there and where his remains could be today. I'll never know, and there is no way to resolve the harm I feel from this. I hope you can consider that when you make your sentencing decision.

Multiple family members ask the Court to impose the maximum sentence possible.  The United States asks the same.

3. <u>Baby Lux's Story</u>

28

On January 26, 2022, Doneysha Smith lost her son, Lux Siloam, to stillbirth. Lux means light in Latin.  Siloam is Greek for sent.  After 18 weeks of pregnancy, she went into premature labor. Doneysha labored and delivered Lux stillborn. She cradled his tiny body and then requested that the hospital cremate Lux and return him to her in time for his memorial service.  She received ashes and kept them in a heart-shaped necklace that she wore.

In April 2023, still wounded and heartbroken from the loss of her son, Doneysha faced different, unfathomable, and devastating news: agents of the Federal Bureau of Investigation ("FBI") informed her that Lux's body had been stolen by a mortician, sold to Jeremy Pauley in Pennsylvania, and then sold again to Matthew Lampi in Minnesota.

Doneysha, and Doneysha's mother, Lynelle, describe the horror and trauma of this experience.

At Scott's sentencing, Lynelle told the Judge:

> My family and I will never get to find peace and healing unless justice is served today. Her desecration of my grandson Lux's remains was evil, disturbing, and criminal. Candace spending lots of years behind bars will be the message needed to put her and those that are like her on notice. She deserves the harshest punishment, because only then will she and her network of monsters who traffic stolen human body parts really know that

her acts are barbaric and will not be tolerated in a society that
actually respects human life even in death

Doneysha asked Judge Miller :

… But what about the continuous nights that I have to think
about not only my child being sent through the mail like an
Amazon package, but who all touched him? Who all
came in contact with him, the fact that we thought that we had
his remains? We had a beautiful memorial for him, and he wasn't
even there. This is something that we will never get over.
Every time his birthday comes around, it's bad enough we
lost him. But then, to have the bandages ripped off the scar,
it's just -- it's disgusting. I understand that people make
mistakes, like I said. But this is a very, very, very hard
thing to deal with. And it's not going to be over. It's going
to be for the rest of my life. When I think about him passing,
I also have to think about how he was trafficked over state lines
and displayed for whatever reason these people wanted when
my son should have been with us the whole time.

Pauley's purchase of Baby Lux is such a gross violation of human

decency.  And yet, it appears to be one he regularly practiced and

practices – stealing the bodies of stillborn babies.  In response to Scott's

inquiry concerning his interest, he was thrilled.

Scott: I know this is a true oddball question, but we get
stillbirths all the time from uams and basically give the
parents back a pinch of ashes from a whole person we
cremated- do you collect fetuses?

Pauley: Omg….. they are my favorite things in the world. I
rarely will get rid of one! These are my babies! Most are

30

"special" in some way but I restore them and give them great homes.

**Scott**: I'll send you examples of what we get. Literally they're like little jello molds so they aren't much of anything, but we do get them by the batches from the hospital.

**Pauley**: Definitely will take a look! Anything fetal or infant is my person favorite in collecting. I find them so serene and peaceful. In what little time they had, they had peace. Which we all spend out lives after birth trying to find. They are beautiful to me.

*See* Gov. Ex. 2, p. 124.

[At this point, Chapman sends pictures of the fetal specimen]

**Pauley**: Omg… So precious! Would have have to preserve them as they would come raw I'm assuming?

**Scott**: I can always wrap them in formaldehyde cotton or alcohol before sending.

**Pauley**: That would be fine I think! I'd pay extra to overnight these just to ensure I can get them injected and in formalin time. But other than that, I will always take all of them, and give them new life in my own way.

…

**Pauley**: Awesome! This is super exciting!

**Scott**: Our forever secret.

*See* Gov. Ex. 2, p. 129.

During this conversation, Pauley sent a picture of his collection: twelve fetuses in jars on a shelf. *See* Gov. Ex. 3, p. 124 (filed under seal).

31

In his conversation with Scott about the bodies of dead babies,

Pauley dismissed entirely the wishes of parents and families, saying:

> **Pauley:** I hate to know these precious little ones get incinerated … they will be permanent fixtures that will be passed down with the rest of my prized pieces for them.
>
> *See* Gov. Ex. 2, p. 129.

And when Scott inquired about just how to ship a dead baby in the

mail, Pauley was quick to offer his expertise.

> **Scott**: Ok educate me on cold packing because this is absolutely first for me lol. And what do I tell the PO?
>
> **Pauley**: No worries! You know those hard blue ice things at the grocery store that you put in lunchboxes? Have them in the bad with the specimen, wrap the bag in bubble wrap. Nothing is liquid or toxic or no special thing to tell the post office. Just need to tell them you want it overnighted (I believe it's called express shipping.) that will keep it until I can get it injected and fix in formalin.
>
> *See* Gov. Ex. 2, p. 129.

Doneysha and Lynelle, driven to eliminate further suffering

similar to their own and with an eye toward honoring the legacy of Lux

Siloam, and bring light to these types of crimes, have since petitioned

the Arkansas legislature to specifically criminalize the sale of human

32

remains.  Legislation, known as "Lux's Law" was signed by Governor Huckabee Sanders in February 2025.[10]  While distance prevents Lux's family from appearing in person at Pauley's sentencing hearing, the Government anticipates that they will provide a video statement that will be offered to defense counsel and the Court when received and presented at the time of sentencing.

Here, the United State seeks to avoid the sterilization warned against in *United States v. Cunningham*, 680 F.Supp.2d 844, 847 (N.D. Ohio, 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012).  The court cautioned that in cases involving abusive images, the images undergo "sterilization" and that this sterilization often "goes far beyond properly removing emotion from sentencing decisions.   Images are described in the most clinical sense.  Victims all too often remain nameless. The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement." *Id.* at 847.

---

[10] Lenora, Josey, "Arkansas governor signs bill criminalizing sale of body parts," Little Rock Public Radio, Feb. 28, 2025 available at https://www.ualrpublicradio.org/local-regional-news/2025-02-28/arkansas-governor-signs-bill-criminalizing-sale-of-body-parts, last visited Dec. 14, 2025.

Hoping to avoid such sterilization, the United States provides the complete, unredacted exchanges recovered from Pauley's Facebook Messenger of conversations between Scott and Pauley from October 2021 to March 2022 for the Court's review. See Gov. Ex. 3, pp. 1-176 (filed under seal).

Baby Lux and his family deserve justice for the pain Pauley so cruelly inflicted upon them. A sentence of 180 months is just.

### C. Assessment of Relevant § 3553(a) Sentencing Factors

The second and final step in the sentencing process is for the Court to consider all applicable factors set forth in Title 18, United States Code, § 3553(a) when fashioning an appropriate, individualized sentence. Here, a sentence of 180 months' imprisonment is necessary. It reflects consideration of the unique nature of the offense and meets the goals of punishment, deterrence, and potential rehabilitation.

(1)   Nature of the offense and just punishment.

The facts and arguments outlined above speak to the especially heinous and egregious nature and circumstances of the offense conduct

in this case. The 180-month sentence is necessary to reflect the seriousness of this offense and to provide just punishment.

(2)  <u>History and characteristics of Pauley</u>

Also relevant in the Government's recommendation is Pauley's personal and criminal history.   Pauley's criminal history paints a concerning picture.  He has been convicted of a violent offense, aggravated assault and terroristic threats, for attempting to stab another man. PSR ¶56.  He has been convicted of corruption of minors for providing a minor with alcohol. PSR ¶57.  More disturbingly, he abandoned the child in a park where she was located by police, unable to care for herself, remember her telephone number or address. Id. He was convicted of theft for lying to a woman and taking $2,600 from her under false pretenses of apprenticeship. PSR ¶58.

Moreover, two of the women who were once involved in long-term relationships with Pauley also paint a concerning picture of the defendant, alleging narcissism, verbal, and physical abuse.  PSR ¶¶68-69.

Pauley does not appear to suffer from addiction, ill health, or mental health problems.  PSR ¶¶74-80.   He does, however, report an

35

unstable and abusive childhood and his education was limited to 9th grade. PSR ¶¶64-66, 81-82.  A 43-year old man, he has not maintained consistent, above-board employment. PSR ¶¶83-91.

The combination of Pauley's criminal history and personal history, paired with a lack of legal employment, and minimal mitigating factors present in his adult life weigh in favor of a punitive, incarcerative sentence.

(3)    Respect for the law and deterrence

The Government also requests the sentence in view of the need for deterrence and to promote respect for the law.

Given the widespread nature of this offense, the need is paramount.  This investigation uncovered a secretive, nationwide market for human remains, most of which are stolen by people, like Cedric Lodge, who are trusted with human remains.  In this case, positive evidence of the thefts was uncovered, and so the perpetrators can be held accountable.  But most such transactions occur in the shadows, and the sources of the remains are undisclosed.  Despite knowing that "wet specimens" and fetal corpses cannot be obtained legally, the down-market trade cannot be prosecuted as it is in this case

without proof that the items are stolen.  Thus, it is vital that, in a case where the evidence proves conclusively that the remains were stolen, a message must be sent to this "oddities" community, that the United States does not tolerate the theft and sale of human remains.  This dark trade must end.

In making its recommendation, the government is also mindful of the relative culpability of all of the defendants who engaged in similar conduct in the related cases.  Several aggravating factors, as outlined above, have led the government to assess Pauley's culpability as the highest in the slew of trafficking defendants charged in the Middle District of Pennsylvania.   Chief among those evaluations was the volume and scale of Pauley's participation in the trade.  He purchased and sold hundreds of thousands of dollars of human remains.

Pauley was and remains a central figure in this disturbing trade. He was the central figure in the nine federal prosecutions that arose from this investigation. His arrest by Pennsylvania State Police and the federal investigation that followed unraveled the tangled network of collectors and salesmen like Pauley who rely on and entice individuals

like Scott and Lodge to steal bodies and human parts from their places of employment.

Also of particular concern to the Government is the need to specifically deter Pauley from continuing to engage in the sale of stolen human remains.  The Government's lesser recommendations in other cases reflected that those individuals no longer engaged in the sale of human remains. The prosecution had a deterrent effect on their behavior.

Here, the Government can think of no other way to stop Pauley from continuing to seek out, engage in, and promote the commodification and sale of human remains.  As outlined above, the United States is not aware of any legal way to acquire human organs or "wets," human skin to tan into leather, or fetuses.   A federal indictment and the supervision of probation did not stop Pauley. Driven by some combination of narcissism and sociopathy, Pauley believes his bizarre ideation with human remains and the human body override the rights of those actual people and the people who loved them. He was and is proud of his work.  He was and is proud of his

collection.  The only way to stop Pauley from pursuing a feature role in the horror show that this investigation unveiled is to incarcerate him.

## IV. CONCLUSION

Charitable human beings donated their bodies to Harvard Medical School's Anatomical Gift Program.  Pauley tanned pieces of one such donor's body into leather.  People in Arkansas lost their mothers, fathers, and children.  Pauley purchased the brains and skin of those beloved people to be kept in his collection or to be sold for the amusement of others within the disturbing "oddities" community. Pauley purchased the body of Baby Lux, casually overriding the wishes of his heartbroken mother and causing her irreparable harm.  Pauley's conduct shocks the conscience.

Accordingly, the United States respectfully requests that the Court vary from the otherwise applicable Guidelines range and impose a sentence of 180 months of imprisonment, a fine of $20,000, $1,700 in restitution, and four years of supervised release.

December 15, 2025                    Respectfully submitted,

39

BRIAN D. MILLER
United States Attorney

By:  /s/ Alisan V. Martin
ALISAN V. MARTIN
Assistant United States Attorney
Attorney I.D. No. PA 316757
United States Attorney's Office
240 West Third Street, Suite 316
Williamsport, PA  17701
Telephone:  570-326-1935
Email:  Alisan.Martin@usdoj.gov

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 4:23-CR-163 |
| v. | : | |
| | : | (C.J. BRANN) |
| JEREMY PAULEY, | : | |
| Defendant | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.  That on this Monday, December 15, 2025, she served a copy of the attached

## GOVERNMENT'S SENTENCING MEMORANDUM

by electronic means to:
Addressee:
Jonathan R. White, Esquire


Dated:  December 15, 2025          /s/ Alisan V. Martin
                                    ALISAN V. MARTIN
                                    Assistant United States Attorney

41